UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

2001 OCT 11 A 10 42

FILED

TANYA HAMMITTE, DAVID STONE,
JOSEPH STEWART, and AMERICAN
INDIAN SERVICES, INC., on behalf of
themselves and all others similarly situated,

       Plaintiffs,

v.

MICHAEL O. LEAVITT, in his official
capacity as Secretary of the Department of
Health and Human Services, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, CHARLES W. GRIM, in his
official capacity as director of Indian Health
Service, and INDIAN HEALTH SERVICE,

       Defendants.

_____/

Case No. 06-11655

HONORABLE AVERN COHN

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
## AND
## DISMISSING CASE

### I. Introduction

This is a case arising out of the provision of medical care to Native Americans

living in Metropolitan Detroit. Plaintiffs Tonya Hamitte, David Stone, Joseph Stewart,

and American Indian Services Inc. (AIS), on behalf of themselves and all others

similarly situated[1] are suing defendants Michael O. Leavitt, in his official capacity as Secretary of the Department of Health and Human Services, the United States Department of Health and Human Services, Charles W. Grim, in his official capacity as director of Indian Health Services, and Indian Health Services. Plaintiffs claim that defendants have (1) breached their statutory fiduciary obligation by failing to provide appropriate health care to Native Americans in the Metropolitan Detroit area and (2) have engaged in irrational, arbitrary, and inequitable distribution of health care resources to urban Native Americans in violation of the Due Process Clause of the Fifth Amendment. Plaintiff seek declaratory and injunctive relief.

Before the Court is defendants' Motion to Dismiss under Fed. R. Civ. P 12(b)(1) and (6) on the grounds that the Court lacks subject matter jurisdiction and the complaint fails to state a claim upon which relief can be granted. The Court heard argument on the motion and directed the parties to file supplemental papers. For the reasons that follow, the motion is GRANTED.

## II. Background

### A.

The United States Department of Health and Human Services ("HHS") provides health care to American Indians consistent with the federal government's general trust and statutory obligations. HHS directs, supervises, and allocates funding for Indian Health Service, a HHS agency. Defendant Michael O. Leavitt is the Secretary of HHS. Defendant Indian Health Service ("IHS"), an agency within HHS, is the principal federal

---

[1]Plaintiffs seek class action status. However, no class has been certified.

2

health care provider of clinical and preventative medical care to all members of federally recognized Indian tribes. Defendant Charles W. Grim is the Director of Indian Health Service.

The Snyder Act of 1921, 25 U.S.C. § 13 and the American Indian Health Care Improvement Act of 1976, as amended ("IHCIA"), 25 U.S.C. § 1601, et seq. authorize IHS to provide health care services to American Indians. The relevant provisions will be discussed in greater detail below. Briefly, the Snyder Act provides:

> The Bureau of Indian Affairs, under supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of Indians throughout the United States for the following purposes ... For the relief of distress and conservation of health.

In 1954, Congress transferred the Bureau of Indian Affairs' authority and responsibilities concerning Indian health to HHS.[2]

The IHCIA established several programs to address particular Indian health needs. Title V of the IHCIA established programs to provide health care services to urban Indians. 25 U.S.C. §§ 1651-1660d.

The Indian Self Determination and Education Assistance Act of 1975, as amended, ("ISDEAA"), 25 U.S.C. § 450 et. seq. authorizes Indian tribes and tribal organizations to contract with IHS to operate certain Snyder Act and IHCIA health care delivery programs independent of IHS.

As will be explained more fully below, IHS is funded through annual appropriations. IHS provides direct health care services to American Indians by 1)

---

[2] Pursuant to 42 U.S.C. § 2001(a).

3

providing health care services directly through its own facilities, 2) funding contracts with tribal governments and tribal organizations to operate health care delivery programs previously operated by IHS, and 3) funding contracts with urban Indian organizations to administer health care programs.

B.

Plaintiffs and the proposed class are urban Native Americans living in metropolitan Detroit who allege that they are not getting the necessary and urgent medical care to which they are entitled. Compl. at ¶ 1. Plaintiffs say that class certification is appropriate under Fed. R. Civ. P 23(a) and (b)(1)(A) and (2). Id. at ¶ 18. Specifically, they request class certification of all persons living in Macomb, Wayne, and Oakland County, and eligible for health care services provided by Indian Health Service. Id. at ¶ 19.

Plaintiffs Tonya Hamitte, David Stone, and Joseph Stewart allege that they suffer from very serious and potentially life-threatening medical conditions that are not being adequately treated due to the defendants' failure to provide adequate health services. Id. at ¶¶ 10-12.

Hamitte is an enrolled member of the Sault Ste. Marie Tribe of Chippewa who alleges defendants are unlawfully failing to provide the medical treatment she needs. Hamitte was diagnosed with an abnormal pap smear 12 years ago. She was instructed to undergo a colposcopy every 6 months for cancer detection. American Indian Health Services did not have the funds to perform the colposcopy, and referred her to a non-AIHS clinic. She alleges was forced to forgo this critical procedure because she could not afford it. Compl. at ¶ 10, ¶¶ 40-48.

4

Stone is an enrolled member of the White Earth Ojibwa Band of Minnesota who alleges that defendants are unlawfully failing to provide him with required medical treatment. Stone was diagnosed with a severe hernia. He was informed that if left untreated the hernia could kill him. AIHS did not have the resources to fund the surgery and referred Plaintiff to a non-AIHS hospital. He says was forced to forego the treatment because he could not afford it. He says he was also unable to obtain the required medical treatment from a reservation hospital and contacted a private physician for the surgery. He says continues to suffer pain and was told by AIHS that this is a result of a botched surgery and they can not help him. Compl. at ¶ 11, ¶¶ 49-59.

Stewart is an enrolled member of the Sault Ste. Marie Tribe of Chippewa who claims that defendants have unlawfully failed to provide him with necessary medical treatment. He says he was diagnosed as suffering from an unidentified liver disease and that AIHS did not have the resources to provide the necessary tests to identify his disease and referred him to a non-AIHS physician. He also says he was forced to forgo an accurate diagnosis and any subsequent monitoring or treatment because he is unable to afford the tests. Compl. at ¶ 12, ¶¶ 60-66.

Plaintiff American Indian Services (AIS) is a non-profit organization that provides social services and emotional support to tribally enrolled American Indians living in metropolitan Detroit. AIS alleges that because Defendants have unlawfully failed to deliver adequate and accessible health care to urban Indians, it has directly payed for medical treatment of its constituents when AIS funds are available. AIS claims this has limited AIS's funds to help other needy individuals. Id. at ¶ 13, 67-70.

5

Plaintiffs allege that defendants' current levels of funding are far below those necessary to maintain basic health services and satisfy their trust obligation. Id. at ¶ 33. Specifically, plaintiffs allege that although IHS is the single largest source of federal spending for American Indians it constitutes only 0.5 percent of the entire budget of HHS. Id. at ¶ 30.

Plaintiffs further allege that two thirds of all Native Americans now live in urban areas, but despite this the funding for urban health care programs has remained at about one percent of IHS's total health care appropriations. Id. at ¶ 25. Plaintiffs also allege that since the overwhelming majority of defendants' funding for health care is provided to Native Americans living on or near reservations, many urban Native Americans are denied necessary and urgent care. Id. at ¶ 36. Plaintiffs further allege that many urban Native Americans live outside any IHS service area. Id. at ¶¶ 37-39.

As explained in plaintiffs' supplemental papers, plaintiffs are raising two claims. First, that because two thirds of Native Americans live in urban areas, defendants' allocation of just 1% of their health care budget to urban areas violates plaintiffs' right to equal protection. Second, plaintiffs claim that defendants' failure to provide adequate health care to plaintiffs and similarly situated Detroit metro area Native Americans violates defendants' health care trust obligation. The first claim is constitutional; the second claim is statutory.

## III. Legal standard

Rule 12(b)(1) provides for a motion to dismiss for lack of jurisdiction. In order to defeat a motion under 12(b)(1), the plaintiff must show only that the complaint alleges a claim under federal law, and that the claim is "substantial." A federal claim is

6

substantial unless "prior decisions inescapably render [it] frivolous." Transcontinental Leasing, Inc. v. Michigan National Bank of Detroit, 738 F.2d 163, 165 (6th Cir. 1984). In short, when faced with a 12(b)(1) challenge to the face of a complaint, the plaintiff can survive the motion by showing any arguable basis in law for the claim made. Musson Theatrical v. Federal Express Corp., 89 F.3d 1244, 1248 (1996).

A motion under Rule 12(b)(6) seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted. "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001). To survive a motion to dismiss under Rule 12(b)(6), a "'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)). "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, ___ U.S. ___, ___, 127 S. Ct. 1955, 1974 (2007).

## IV. Analysis

### A. Jurisdiction/Standing

1.

Defendants argue that the complaint must be dismissed because plaintiffs lack standing. Plaintiffs claim that the court has jurisdiction to grant declaratory and

7

injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57, and § 5 U.S.C. § 702, the Administrative Procedure Act (APA) which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof."

Standing is a core component of the case or controversy requirement of Article III of the U.S. Constitution. DaimlerChrysler Corp. v. Cuno, __U.S.__, 126 S. Ct. 1854 (2006). In order to meet this requirement, a "plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Id. At 1861. In addition, each "plaintiff must demonstrate standing separately for each form of relief sought." Id. at 1867. Courts have referred to the three elements of Article III standing as "injury in fact", "causation," and "redressiblility." See, e.g., Center for Biological Diversity v. Lueckel, 417 F.3d 532, 536 (6th Cir. 2005).

2.

Defendants argue that none of the plaintiffs plead a claim that meets the jurisdictional requirements of causation and redressabliity, and AIS fails to even plead injury in fact. In support, defendants rely on DaimlerChrylser Corp. v. Cuno, __U.S.__, 126 S. Ct. 1854 (2006). In DaimlerChrylser, taxpayers in Toledo, Ohio brought suit to challenge tax waivers accorded the DaimlerChrysler Corporation, on the ground that "tax breaks for DaimlerChrysler diminished the funds available to the city and State, imposing a 'disproportionate burden' on plaintiffs." Id. at 1859. The Supreme Court

8

held that the plaintiff taxpayers lacked standing because the injury the taxpayers alleged was not "concrete and particularized." Id. at 1862.

Defendants also rely on Eastern Kentucky Welfare Rights Organization v. Simon, 426 U.S. 26 (1976). In that case, the Supreme Court held that plaintiffs lacked standing to challenge under the APA a revenue ruling that provided favorable tax treatment to a nonprofit hospital that offered only emergency-room services to indigents instead of full patient services. Id. at 28. The Supreme Court stated that the individual plaintiffs failed to establish that the asserted injury was the consequence of the defendant's actions and that there was no substantial likelihood that victory in the suit would result in the plaintiffs receiving the hospital treatment they desired. Id. at 44-45. The Supreme Court further stated that the organizational plaintiffs failed to allege any injury themselves separate from those pleaded by the individual members and thus failed to meet the injury in fact requirement of Article III standing. Id. at 40.

Plaintiffs say that they have alleged a concrete injury by IHS sufficient to confer standing. Specifically, they say that they were denied essential medical treatment due to "defendant's failure to provide adequate health care services to" urban American Indians in metropolitan Detroit. Compl. at ¶¶ 6, 10-12, 44, 45, 54, 58, 59, 63-65. They further allege that these denials were the direct result of "defendants' inappropriate and arbitrary actions." Id. at ¶ 5.

Plaintiffs also argue that their claims are a direct challenge to the unlawful denial of benefits that are specially designated for Native Americans. They distinguish their claim from the generalized claim brought by citizens in DaimlerChrysler. Further, they

9

argue that Simon is not applicable because plaintiffs' claim is redressible by the relief sought, which is health care. They characterize themselves as intended beneficiaries making a claim for benefits. In support, they rely on Heckler v. Mathews, 465 US 728 (1983), in which the Court found a "direct causal relationship between the Government's alleged deprivation of appellee's right to equal protection and the personal injury appellee has suffered -- denial of Social Security benefits solely on the basis of his gender." Id. at 740. Plaintiffs argue that under Heckler standing can be established if plaintiffs show a threatened or actual injury that is traceable to the alleged unlawful conduct and "is likely to be addressed by at favorable decision." Id. at 738. Plaintiffs' position is that their claim is a direct claim by an intended beneficiary that is based upon a violation of Equal Protection, and they have the requisite standing.

3.

Plaintiff's beneficiary argument based on Heckler is persuasive in distinguishing Cuno and Simon. Unlike Cuno and Simon, plaintiffs' allegations are not generalized claims, but rather involve direct claims by intended beneficiaries. Plaintiffs have alleged a concrete injury as a result of the denial of health care benefits owed to them under the Synder Act and the IHCIA. This "injury" is alleged to be at the hands of IHS which has the authority and obligation to provide the health care benefits. Like Heckler, there is a casual relationship between the alleged denial of health care benefits by IHS on the basis of residence and the personal injury suffered by plaintiffs.

Furthermore, plaintiffs have met the redressablility prong because the relief they seek is an injunction requiring the delivery of health care benefits. They also seek a

10

declaration that defendants' basis for denying health care benefits on the basis of whether an beneficiary resides on a reservation or metropolitan Detroit is unlawful. There is an arguable basis in law for plaintiff's claims. Therefore, plaintiffs have standing.

## B. Plaintiffs' Claims

### 1. Statutory Claim - Breach of Trust

a.

Defendants next argue that plaintiffs' statutory claim, claiming breach of fiduciary obligation, should be dismissed because the allocation of funds from IHS's lump sum appropriation is committed to "agency discretion by law," and therefore the claim is barred from judicial review based on the exception under the Administrative Procedures Act (APA). Plaintiffs say that this claim is not barred by the APA and their claim is based on defendants' legal obligations to provide health care.

b.

Plaintiffs' statutory claim, entitled "breach of fiduciary obligation" reads as follows:

> Defendants have breached and continue to breach their fiduciary duty to appropriate resources in a calculated and non-arbitrary manner consistent with their responsibility as trustee, pursuant to their general trust obligation in conjunction with the statutory mandates of the Snyder Act, 25 U.S.C. § 13 (1921) and the Indian Health Care Improvement Act, 25 U.S.C. § 1601 (1992) to provide plaintiffs and plaintiff class with the adequate and accessible health care to which they are entitled.

Complaint at ¶ 72. While the complaint refers to the Snyder Act and the IHCIA, in their response brief, plaintiffs do not rely exclusively on any statute for their claim but rather

11

the claim is based on the government's "general trust obligation" to provide urban Indian people with "adequate and accessible health care."

c.

Defendants say that this claim is barred by the APA. The APA provides that a "person ... adversely affected or aggrieved by agency action ... is entitled to judicial review. 5 U.S.C. § 702. Review of agency action is not permitted when a statute expressly excludes it or "the agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This narrow exception applies where there is no "meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 838 (1985).

In support, defendants cite Lincoln v. Virgil, 508 U.S.182 (1993). In Lincoln, the Supreme Court held that a federal agency's discontinuance of a clinical program for Indian children with handicaps was not subject to judicial review under the APA. The defendants argue this case is similar to the Lincoln in that the plaintiffs alleged violations of a federal trust responsibility, the Snyder Act, and the IHCIA, the APA act, and the Fifth Amendment's Due Process Clause. The Court held that the IHS's decision to discontinue the program for handicapped Indian children was "unreviewable under § 701(a)(2)." Id. at 193. "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible objectives" its actions are not subject to review by the courts. Id.

Plaintiffs cite two cases to support their statutory claim. First, in White v. Califano, 437 F. Supp. 543 (S.D.D. 1978), a mentally ill Indian living on a reservation was in need of psychiatric treatment. She was not able to obtain such care, however,

12

because the State of South Dakota and the federal government each argued that the

other was responsible for the care. Plaintiffs sued, claiming in part that the government

breached its trust obligation. In finding that the government, not the State, was

responsible for plaintiff's care, the district court examined in detail "the dimensions of

the trust relationship between Indians and the federal government." Based on the

existence of a such a trust relationship, the district court held that

> Congress has unambiguously declared that the federal government has a
> legal responsibility to provide health care to Indians. This stems from the
> "unique relationship" between Indians and the federal government, a relationship
> that is reflected in hundreds of cases and is further made obvious by the fact that
> one bulging volume of the U.S. Code pertains only to Indians.

Id. at 555. The Court of Appeals for the Eighth Circuit affirmed without further

elaboration. White v. Califano, 581 F.2d 697 (8th Cir. 1978).

Plaintiffs also cite McNabb v. Heckler, 628 F. Supp. 544 (D. Mont. 1978). In

McNabb, Native Americans sued the federal government and a county for payment of

their child's medical bills, claiming in part that the failure to pay was a breach of its

obligations. As in White, the federal government and the locality (county) disputed who

was responsible. In holding that the federal government was responsible, the district

court found that the trust doctrine, the Snyder Act, and the IHCIA require the

government (IHS) to "assure reasonable health care for eligible members." Id. at 549.

In affirming, the Court of Appeals for the Ninth Circuit noted that "reviewing the text of

the IHCIA and the relevant legislative history, one is struck by Congress' recognition of

federal responsibility for Indian health care." McNabb v. Heckler, 829 F.2d 787, 792 (9th

Cir. 1987).

13

As defendants note, plaintiffs' authority is not analogous. In both White and McNabb, the IHS acknowledged an obligation to pay for the plaintiffs' health care services but for what it viewed as a primary obligation of the State to pay. They are fact-bound decisions regarding the coordination of benefits between a State and the IHS. Although both cases talk about the government's trust obligation to Native Americans, they do not, in the Court's view, stand for the broad proposition that the IHS must fund specific health care services for specific Native American groups on the basis of a "free standing trust obligation." To the contrary, Lincoln, rejects such a notion to provide health care to a specific group of Native Americans. Lincoln makes clear that lump-sum appropriations are not reviewable.

d.

The key question is whether Congress has appropriated lump sums for health services to all Native Americans. If so, then defendants are correct that plaintiffs' claims would fall within the purview of Lincoln and be barred by the APA. Because an understanding of the interplay between the various statutes and the government's obligation to Indian health care lies at the core of whether plaintiffs can make out a statutory claim, the Court directed the parties to file supplemental papers. The papers consisted supplemental briefs and documents, as follows:

> Submitted by Plaintiffs:
> A draft form of judgment or decree
>
> The statutory scheme relating to Congress' obligation to provide Indian Health Care Services
>
> Submitted by Defendants:

14

> 2006 Indian Health Services Appropriations and House Conference
> Report
>
> Indian Health Care Statutes
>
> IHS Budget Formulation, FY 2006 Budget Request, Justification of
> Estimates for Appropriations Committees

What can be generally gleaned from these materials follows. The Snyder Act, 25 U.S.C. § 13, authorizes the Secretary of the Interior "to expend such moneys as Congress may from time appropriate, for the benefit . . . of the Indians throughout the United States . . .[f]or relief of distress and conservation of health. The Transfer Act, 42 U.S.C. § 2001(a), transferred the functions of the Secretary of the Interior to the Secretary of Health and Human Services. The IHCIA established particular programs for "the conservation of health" of Native Americans, including programs for Native Americans living in urban areas, which are described in Title V. Indeed, 25 U.S.C. § 1651, states that the purpose of Title V "is to establish programs in urban centers to make health services more accessible to urban Indians." Title V goes on to detail features of a contract between the IHS and an urban Indian organization.

What is most compelling in the supplemental papers, however, is not the various statutory provisions. The budgetary materials, particularly the Appropriations Act of 2006 relating to the appropriation for Indian Health Services is most relevant. It states in part:

> For expenses necessary to carry out the [Snyder Act], the Indian Self-
> Determination Act, the Indian Health Care Improvement Act, and titles II and III
> of the Public Health Service Act with respect to the Indian Health Service,
> $2,732,298,000 . . .

15

PL 109-54, 2005 HR 2361, 119 Stat. 499. There is no mention of Title V of the IHCIA in the Appropriations Act. The Conference Report accompanying the Appropriations Act similarly states:

The conference agreement provides $2,732,298,000 for Indian health services as proposed by the House instead of $2,732,323,000 proposed by the Senate.

HR 109-188, at p. 126 (2005). There are similar statements as to appropriations for Indian facilities.

From the foregoing, it must be concluded that Congress makes a lump sum appropriation for Indian health services and Indian services to the IHS and it is up to IHS to allocate the funds in accordance with the statutory obligations and objectives, including funding for urban Native Americans. In other words, Congress has left to the IHS's discretion the allocation of appropriated funds among its units that provide health care services to Native Americans. This includes tribally operated programs and urban Indian programs. This is borne out in the IHS's budget materials, attached as Exhibit A. These clearly show that urban health services are one of many programs and services funded by IHS with the lump-sum appropriation. In the absence of Congressionally mandated direction for the allocation of appropriated funds for urban Native Americans, the IHS's allocation of those funds cannot be found to violate either the Snyder Act or the IHCIA based on the Supreme Court's holding in Lincoln.

Plaintiffs, however, argue that their breach of trust claim is different from Lincoln because they allege that they have been denied essential and potentially life-saving services. This is in contrast to Lincoln in which the plaintiffs were demanding that a specific local program be started or maintained or that defendants should change their

allocation among programs. Plaintiffs argue that they do seek a shift in the balance of spending between reservation Indians and urban Indians. In short, plaintiffs say that their claim is not about discretion regarding spending, but rather a total breach of the legal obligations owed by defendants to provide health care to urban Indians. Plaintiffs' argument is simply not supported by the documentary materials as to how the appropriations to the IHS operates. Congress has chosen to implement its views regarding Indian health care by enacting the Snyder Act and the IHCIA, in which it conferred on the IHS broad discretion in how to best provide services to Native Americans. Congress declined to create vested rights in any particular Indian health program or service, nor did it specify how the IHS was to fund any program or service. The IHS's discretionary decision is not subject to review under the APA. As such, plaintiffs' statutory claim fails to state a claim upon which relief may be granted.

### 2. Equal Protection Claim

#### a.

Defendants argue that plaintiffs' constitutional claim regarding IHS's allocation of scarce funds among various programs should be dismissed because their actions are within their discretion and not unreasonable. Plaintiffs say that this claim should not be dismissed as they have alleged that defendants engaged in irrational, arbitrary, and inequitable distribution of health care resources to urban American Indians in comparison to Indians living on or near reservations.

#### b.

In their Equal Protection claim, plaintiffs allege that they as urban Indians have been denied necessary and urgent medical care because the overwhelming majority of

17

the Defendants' funding for health care is provided for American Indians living on or near reservations or trust lands. Compl. at ¶ 36. Plaintiffs allege that defendants allocate 1% of their health care dollars to urban American Indians who make up 66% of their constituency. Id. at ¶ 4. Plaintiffs also allege that 99% of the health care appropriations go to those living on or near the reservations. Id. at ¶ 25. They claim that this alleged irrational, arbitrary, and inequitable distribution of healthcare resources violates their Equal Protection rights. Id. at ¶ 1.

Plaintiffs rely on Rincon Band of Mission Indians v. Califiano 464 F.Supp. 934, 939 (N.D. Ca. 1979), aff'd on other grounds, Rincon v. Harris, 618 F.2d 569 (9th Cir. 1980). In Rincon, the district court held that IHS's system of allocating health care funds violated the plaintiff's due process rights because IHS, "without a rational basis, denied the vast majority of California Indians health services" as compared to the services received by Native Americans elsewhere in the country. Plaintiffs also cite Dandrige v. Williams, 397 U.S. 471, 501-02 (1970), where the Supreme Court held that if a classification for distribution of federal benefits was "reasonable" it did not violate the plaintiff's equal protection rights.

c.

Plaintiffs' position is not persuasive. The government has broad discretion to allocate funds for discretionary programs without violating equal protection rights. In Dandrige v. Williams, 397 U.S. 471, 485 (1971), the Supreme Court held:

> In the area of economics and social welfare, a State does not violated the Equal Protection Clause merely because the classifications made familiarizing its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not

18

made with mathematical nicety or because in practice it results in some inequality.

As defendants cogently state:

> To the extent that Congress' rational choice to fund self-determination contract with tribes for Indian health care may have resulted in less availability of direct health services for urban Indians than would be optimally desirable, the Fifth Amendment does not require anything different. In 1976, Congress enacted Title V in order to supplement the IHS system by extending health care services to an urban Indian population that previously was not receiving any direct care from the IHS. In designing the urban Indian health programs under Title V, Congress anticipated and addressed the likelihood that urban Indians would have access for their health care services resources not funded by IHS when it included amount the functions of turban Indian organizations funded under Title V such activities as identifying other available resources, familiarizing urban Indians with such resources, and even assisting other resources to provide services to urban Indians. This is a rational approach to the allocation of scare resources.

Defendants' brief at p. 15. Plaintiffs have simply failed to state a viable Equal

Protection claim.

## V. Conclusion

In the end, plaintiffs' complaint raises policy issues, not legal issues, as to the

proper allocation of resources. Their concerns are best addressed through the

legislative, not the judicial, process.

SO ORDERED.

_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:
    Detroit, Michigan

19

# Exhibit A

## Indian Health Service
### ALL PURPOSE TABLE
(Dollars in Thousands)

| Sub-Sub Activity | FY 2004 Appropriation | Final FY 2005 Appropriation | Revised FY 2006 Pres.Budget |
|---|---|---|---|
| **SERVICES:** | | | |
| Hospitals & Health Clinics | 1,249,781 | 1,289,418 | 1,359,541 |
| Dental Services | 104,513 | 109,023 | 119,489 |
| Mental Health | 53,294 | 55,060 | 59,328 |
| Alcohol & Substance Abuse | 138,250 | 139,073 | 145,336 |
| Contract Health Services | 479,070 | 498,068 | 525,021 |
| Total, Clinical Services | 2,024,908 | 2,090,642 | 2,208,715 |
| Public Health Nursing | 42,581 | 45,015 | 49,690 |
| Health Education | 11,793 | 12,429 | 13,787 |
| Community Health Reps | 50,996 | 51,365 | 53,737 |
| Immunization AK | 1,561 | 1,572 | 1,645 |
| Total, Preventive Health | 106,931 | 110,381 | 118,859 |
| Urban Health | 31,919 | 31,663 | 32,058 |
| Indian Health Professions | 30,774 | 30,392 | 31,503 |
| Tribal Management | 2,376 | 2,343 | 2,430 |
| Direct Operation | 60,714 | 61,649 | 63,123 |
| Self Governance | 5,644 | 5,586 | 5,752 |
| Contract Support Costs | 267,398 | 263,683 | 268,683 |
| TOTAL, SERVICES | 2,530,364 | 2,596,492 | 2,732,298 |
| **FACILITIES:** | | | |
| Maintenance & Improvement | 48,897 | 49,204 | 49,904 |
| Sanitation Facilities Construction | 93,015 | 91,767 | 93,519 |
| Health Care Facilities Construction | 94,554 | 88,597 | 3,326 |
| Facilities & Environmental Health Support | 137,803 | 141,669 | 150,959 |
| Equipment | 17,081 | 17,337 | 17,960 |
| TOTAL, FACILITIES | 391,350 | 388,574 | 315,668 |
| TOTAL, BUDGET AUTHORITY | 2,921,714 | 2,985,066 | 3,047,966 |
| **Collections:** | | | |
| Medicare | 129,402 | 130,323 | 132,156 |
| Medicaid | 446,000 | 449,661 | 456,185 |
| Private Insurance | 52,845 | 52,845 | 53,579 |
| Quarters | 6,172 | 6,200 | 6,288 |
| Total, Collections | 634,419 | 639,029 | 648,208 |
| Special Diabetes Program for Indians | 150,000 | 150,000 | 150,000 |
| TOTAL, PROGRAM LEVEL | 3,706,133 | 3,774,095 | 3,846,174 |

### Indian Health Service
#### FY 2006 President's Budget Request
#### Detail of Changes
(Dollars in Thousands)

| Sub Sub Activity | FY 2005 Final Enacted | Collections Increase | Federal/ Tribal/Urban Pay | Staffing for New Fac. | Hlth Care Fac.Const. | Contract Support Costs | Inflation @ 2.6/3.1% | Population Growth @ 1.4% | Current Services Subtotal | IT Reduction | Admin Reduction | FY 2006 Budget Request |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SERVICES:** | | | | | | | | | | | | |
| Hospitals & Health Clinics | 1,289,418 | 0 | 20,537 | 18,480 | 0 | 0 | 15,861 | 18,200 | 73,178 | (1,707) | (1,348) | 1,359,541 |
| Dental Services | 109,023 | 0 | 2,001 | 5,832 | 0 | 0 | 1,096 | 1,537 | 10,466 | 0 | 0 | 119,489 |
| Mental Health | 55,060 | 0 | 928 | 1,885 | 0 | 0 | 679 | 776 | 4,268 | 0 | 0 | 59,328 |
| Alcohol & Substance Abuse | 139,073 | 0 | 2,217 | 0 | 0 | 0 | 2,086 | 1,980 | 6,283 | 0 | 0 | 145,336 |
| Contract Health Services | 498,068 | 0 | 0 | 1,026 | 0 | 0 | 18,906 | 7,021 | 26,953 | 0 | 0 | 525,021 |
| Total, Clinical Svcs | 2,090,642 | 0 | 25,683 | 27,223 | 0 | 0 | 38,728 | 29,494 | 121,128 | (1,707) | (1,348) | 2,208,715 |
| Public Health Nursing | 45,015 | 0 | 852 | 2,822 | 0 | 0 | 367 | 634 | 4,675 | 0 | 0 | 49,690 |
| Health Education | 12,429 | 0 | 214 | 805 | 0 | 0 | 164 | 175 | 1,358 | 0 | 0 | 13,787 |
| Comm. Health Reps | 51,365 | 0 | 863 | 0 | 0 | 0 | 785 | 724 | 2,372 | 0 | 0 | 53,737 |
| Immunization AK | 1,572 | 0 | 27 | 0 | 0 | 0 | 24 | 22 | 73 | 0 | 0 | 1,645 |
| Total, Prev Hlth | 110,381 | 0 | 1,956 | 3,627 | 0 | 0 | 1,340 | 1,555 | 8,478 | 0 | 0 | 118,859 |
| Urban Health | 31,816 | 0 | 483 | 0 | 0 | 0 | 485 | 449 | 1,417 | 0 | 0 | 33,233 |
| Indian Health Professions | 30,392 | 0 | 44 | 0 | 0 | 0 | 1,067 | 0 | 1,111 | 0 | 0 | 31,503 |
| Tribal Management | 2,343 | 0 | 0 | 0 | 0 | 0 | 87 | 0 | 87 | 0 | 0 | 2,430 |
| Direct Operation | 61,849 | 0 | 1,117 | 0 | 0 | 0 | 357 | 0 | 1,474 | 0 | 0 | 63,123 |
| Self Governance | 5,586 | 0 | 18 | 0 | 0 | 0 | 148 | 0 | 166 | 0 | 0 | 5,752 |
| Contract Support Costs | 263,683 | 0 | 0 | 0 | 0 | 5,000 | 0 | 0 | 5,000 | 0 | 0 | 268,683 |
| Total, Services | 2,596,492 | 0 | 29,301 | 30,850 | 0 | 5,000 | 42,212 | 31,498 | 138,861 | (1,707) | (1,348) | 2,732,298 |
| **FACILITIES:** | | | | | | | | | | | | |
| Maintenance & Improvement | 49,204 | 0 | 0 | 0 | 0 | 0 | 700 | 0 | 700 | 0 | 0 | 49,904 |
| Sanitation Facilities Construction | 91,767 | 0 | 0 | 0 | 0 | 0 | 1,752 | 0 | 1,752 | 0 | 0 | 93,519 |
| Hlth Care Facilities Construction | 88,597 | 0 | 0 | 0 | (85,271) | 0 | 0 | 0 | (85,271) | 0 | 0 | 3,326 |
| Facil. & Envir. Hlth Supp | 141,669 | 0 | 2,496 | 3,992 | 0 | 0 | 805 | 1,987 | 9,290 | 0 | 0 | 150,959 |
| Equipment | 17,337 | 0 | 0 | 0 | 0 | 0 | 623 | 0 | 623 | 0 | 0 | 17,960 |
| Total, Facilities | 388,574 | 0 | 2,496 | 3,992 | (85,271) | 0 | 3,880 | 1,987 | (72,906) | 0 | 0 | 315,668 |
| | | | | | | | | | | | | |
| Total, IHS | 2,985,066 | 0 | 31,797 | 34,842 | (85,271) | 5,000 | 46,092 | 33,495 | 65,955 | (1,707) | (1,348) | 3,047,966 |
| **Collections:** | | | | | | | | | | | | |
| Medicare | 130,323 | 1,833 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 132,156 |
| Medicaid | 449,661 | 6,524 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 456,185 |
| Private Insurance | 52,845 | 734 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53,579 |
| Quarters | 6,200 | 88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,288 |
| Total, Collections | 639,029 | 9,179 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 648,208 |
| | | | | | | | | | | | | |
| Spec.Diabetes Prog for Indians | 150,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150,000 |
| Total, SDPI | 150,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150,000 |
| | | | | | | | | | | | | |
| GRAND TOTAL | 3,774,095 | 9,179 | 31,797 | 34,842 | (85,271) | 5,000 | 46,092 | 33,495 | 65,955 | (1,707) | (1,348) | 3,846,174 |

# Indian Health Service
## Breakdown of Program Level
## FY 2004 – FY 2005
(Dollars in Thousands)

| Sub Sub Activity | 2004 Actual | | | | | 2005 Appropriation | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Budget Authority | Private Insurance Collections | Medicare/ Medicaid | Personnel Quarters | Total Program Level | Budget Authority | Private Insurance Collections | Medicare/ Medicaid | Personnel Quarters | Total Program Level |
| **SERVICES:** | | | | | | | | | | |
| Hospitals & Health Clinics | 1,249,781 | 52,845 | 575,402 2/ | 0 | 1,878,028 | 1,289,418 | 52,845 | 579,984 2/ | 0 | 1,922,247 |
| Dental Health | 104,513 | 0 | 0 | 0 | 104,513 | 109,023 | 0 | 0 | 0 | 109,023 |
| Mental Health | 53,294 | 0 | 0 | 0 | 53,294 | 55,060 | 0 | 0 | 0 | 55,060 |
| Alcohol & Substance Abuse | 138,250 | 0 | 0 | 0 | 138,250 | 139,073 | 0 | 0 | 0 | 139,073 |
| Contract Health Services | 479,070 | 0 | 0 | 0 | 479,070 | 498,068 | 0 | 0 | 0 | 498,068 |
| Total, Clinical Svcs | 2,024,908 | 52,845 | 575,402 | 0 | 2,653,155 | 2,090,642 | 52,845 | 579,984 | 0 | 2,723,471 |
| Public Health Nursing | 42,581 | 0 | 0 | 0 | 42,581 | 45,015 | 0 | 0 | 0 | 45,015 |
| Health Education | 11,793 | 0 | 0 | 0 | 11,793 | 12,429 | 0 | 0 | 0 | 12,429 |
| Comm. Health Reps | 50,996 | 0 | 0 | 0 | 50,996 | 51,365 | 0 | 0 | 0 | 51,365 |
| Immunization AK | 1,561 | 0 | 0 | 0 | 1,561 | 1,572 | 0 | 0 | 0 | 1,572 |
| Total, Prev Hlth | 106,931 | 0 | 0 | 0 | 106,931 | 110,381 | 0 | 0 | 0 | 110,381 |
| Urban Health | 31,619 | 0 | 0 | 0 | 31,619 | 31,816 | 0 | 0 | 0 | 31,816 |
| Indian Health Professions | 30,774 | 0 | 0 | 0 | 30,774 | 30,392 | 0 | 0 | 0 | 30,392 |
| Tribal Management | 2,376 | 0 | 0 | 0 | 2,376 | 2,343 | 0 | 0 | 0 | 2,343 |
| Direct Operation | 60,714 | 0 | 0 | 0 | 60,714 | 61,649 | 0 | 0 | 0 | 61,649 |
| Self Governance | 5,644 | 0 | 0 | 0 | 5,644 | 5,586 | 0 | 0 | 0 | 5,586 |
| Contract Support Costs | 267,398 | 0 | 0 | 0 | 267,398 | 263,683 | 0 | 0 | 0 | 263,683 |
| Total, Services | 2,530,364 | 52,845 | 575,402 | 0 | 3,158,611 | 2,596,492 | 52,845 | 579,984 | 0 | 3,229,321 |
| **FACILITIES:** | | | | | | | | | | |
| Maint. & Improvement | 48,897 | 0 | 0 | 6,172 | 55,069 | 49,204 | 0 | 0 | 6,200 | 55,404 |
| Sanitation Facilities | 93,015 | 0 | 0 | 0 | 93,015 | 91,767 | 0 | 0 | 0 | 91,767 |
| Hlth Care Facs. Constr. | 94,554 | 0 | 0 | 0 | 94,554 | 88,597 | 0 | 0 | 0 | 88,597 |
| Fac& & Envir. Hlth Support | 137,803 | 0 | 0 | 0 | 137,803 | 141,669 | 0 | 0 | 0 | 141,669 |
| Equipment | 17,081 | 0 | 0 | 0 | 17,081 | 17,337 | 0 | 0 | 0 | 17,337 |
| Total, Facilities | 391,350 | 0 | 0 | 6,172 | 397,522 | 388,574 | 0 | 0 | 6,200 | 394,774 |
| Total, IHS | 2,921,714 | 52,845 | 575,402 | 6,172 | 3,556,133 | 2,985,066 | 52,845 | 579,984 | 6,200 | 3,624,095 |
| Special Diabetes Program for Indians 1/ | 150,000 | 0 | 0 | 0 | 150,000 | 150,000 | 0 | 0 | 0 | 150,000 |
| **GRAND TOTAL** | 3,071,714 | 52,845 | 575,402 | 6,172 | 3,706,133 | 3,135,066 | 52,845 | 579,984 | 6,200 | 3,774,095 |

1/ The Balanced Budget Act of 1997 transfers $30,000,000 annually to IHS for diabetes prevention and treatment for FY 1998 through FY 2002. An additional $70,000,000 was received under the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 for FY 2001 and FY 2002, and $100,000,000 is available for FY 2003. For FY 2004, the Special Diabetes Program for Indians has been reauthorized for a new total of $150,000,000.

2/ Includes $29,203,000 in Medicaid/Medicare for CMS estimates of tribal collections as well as $106,302,000 for tribal direct collection estimates, which began in FY 2002.

## Indian Health Service
### Breakdown of Program Level
### FY 2006
(Dollars in Thousands)

| Sub Sub Activity | 2006 Estimate | | | | | Increase/Decrease Of 2006 Over 2005 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Budget Authority | Private Insurance Collections | Medicare/ Medicaid | Personnel Quarters | Total Program Level | Budget Authority | Private Insurance Collections | Medicare/ Medicaid | Personnel Quarters | Total Program Level |
| **SERVICES:** | | | | | | | | | | |
| Hospitals & Health Clinics | 1,358,541 | 53,579 | 588,341 2/ | 0 | 2,001,461 | 70,123 | 734 | 8,357 | 0 | 79,214 |
| Dental Health | 119,469 | 0 | 0 | 0 | 119,469 | 10,466 | 0 | 0 | 0 | 10,466 |
| Mental Health | 59,328 | 0 | 0 | 0 | 59,328 | 4,268 | 0 | 0 | 0 | 4,268 |
| Alcohol & Substance Abuse | 145,336 | 0 | 0 | 0 | 145,336 | 6,263 | 0 | 0 | 0 | 6,263 |
| Contract Health Services | 525,021 | 0 | 0 | 0 | 525,021 | 26,953 | 0 | 0 | 0 | 26,953 |
| Total Clinical Svcs | 2,208,715 | 53,579 | 588,341 | 0 | 2,850,635 | 118,073 | 734 | 8,357 | 0 | 127,164 |
| Public Health Nursing | 49,690 | 0 | 0 | 0 | 49,690 | 4,675 | 0 | 0 | 0 | 4,675 |
| Health Education | 13,787 | 0 | 0 | 0 | 13,787 | 1,358 | 0 | 0 | 0 | 1,358 |
| Comm. Health Reps | 53,737 | 0 | 0 | 0 | 53,737 | 2,372 | 0 | 0 | 0 | 2,372 |
| Immunization AK | 1,845 | 0 | 0 | 0 | 1,845 | 73 | 0 | 0 | 0 | 73 |
| Total, Prev Hlth | 118,859 | 0 | 0 | 0 | 118,859 | 8,478 | 0 | 0 | 0 | 8,478 |
| Urban Health | 33,233 | 0 | 0 | 0 | 33,233 | 1,417 | 0 | 0 | 0 | 1,417 |
| Indian Health Professions | 31,503 | 0 | 0 | 0 | 31,503 | 1,111 | 0 | 0 | 0 | 1,111 |
| Tribal Management | 2,430 | 0 | 0 | 0 | 2,430 | 87 | 0 | 0 | 0 | 87 |
| Direct Operation | 63,123 | 0 | 0 | 0 | 63,123 | 1,474 | 0 | 0 | 0 | 1,474 |
| Self Governance | 5,752 | 0 | 0 | 0 | 5,752 | 166 | 0 | 0 | 0 | 166 |
| Contract Support Costs | 268,683 | 0 | 0 | 0 | 268,683 | 5,000 | 0 | 0 | 0 | 5,000 |
| Total, Services | 2,732,298 | 53,579 | 588,341 | 0 | 3,374,218 | 135,836 | 734 | 8,357 | 0 | 144,897 |
| **FACILITIES:** | | | | | | | | | | |
| Maint. & Improvement | 49,904 | 0 | 0 | 6,288 | 56,192 | 700 | 0 | 0 | 88 | 788 |
| Sanitation Facilities | 93,519 | 0 | 0 | 0 | 93,519 | 1,752 | 0 | 0 | 0 | 1,752 |
| Hlth Care Facs. Constr. | 3,326 | 0 | 0 | 0 | 3,326 | (85,271) | 0 | 0 | 0 | (85,271) |
| Facil. & Envir. Hlth Support | 150,959 | 0 | 0 | 0 | 150,959 | 9,290 | 0 | 0 | 0 | 9,290 |
| Equipment | 17,960 | 0 | 0 | 0 | 17,960 | 623 | 0 | 0 | 0 | 623 |
| Total Facilities | 315,668 | 0 | 0 | 6,288 | 321,956 | (72,906) | 0 | 0 | 68 | (72,818) |
| Total, IHS | 3,047,966 | 53,579 | 588,341 | 6,288 | 3,696,174 | 62,930 | 734 | 8,357 | 88 | 72,079 |
| Special Diabetes Program for Indians 1/ | 150,000 | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 0 | 0 |
| GRAND TOTAL | 3,197,966 | 53,579 | 588,341 | 6,288 | 3,846,174 | 62,930 | 734 | 8,357 | 88 | 72,079 |

1/ The Balanced Budget Act of 1997 transfers $30,000,000 annually to IHS for diabetes prevention and treatment for FY 1998 through FY 2002. An additional $70,000,000 was received under the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 for FY 2001 and FY 2002, and $100,000,000 is available for FY 2003. For FY 2004, the Special Diabetes Program for Indians has been reauthorized for a new total of $150,000,000.

2/ Includes $29,200,000 in Medicaid/Medicare for CMS estimates of tribal collection estimates as well as $106,302,000 for tribal direct collection estimates, which began in FY 2002.